# Imposition of Agricultural Export Controls Under § 5 of the Export Administration Act of 1979

Export of agricultural commodities can be restrained under the national security controls of § 5 of the Export Administration Act of 1979 only if the exports in question constitute "a significant contribution to the military potential" of the importing country.

Whether grain exports will contribute significantly to the military potential of the Soviet Union is a question of fact for the President to determine.

January 17, 1980

THE COUNSEL TO THE PRESIDENT

MY DEAR SIR: I am responding to your memorandum of January 14, 1980, regarding the availability of § 5 of the Export Administration Act of 1979, 50 U.S.C. App. § 2404, as a basis for the imposition of agricultural export controls on exports to the Soviet Union. I agree that there is sufficient factual basis to conclude that the invasion of Afghanistan by the Soviet Union threatens the security of neighboring countries, including Pakistan, and therefore threatens our security as defined by § 3(2)(A) of the Act, 50 U.S.C. App. § 2404(2)(A). I also agree that § 7(g)(1) of the 1979 Act contemplates that under appropriate circumstances the export of agricultural commodities can be restrained under the national security controls of § 5. *See* 50 U.S.C. App. § 2406(g)(1).

The remaining question is whether exports of grain in the amounts involved here constitute "a significant contribution to the military potential" of the Soviet Union as required by § 3(2)(A) of the 1979 Act. The quoted language first appeared in the Export Administration Act in 1962. Between 1949, when the Export Administration Act was first adopted, and 1962, the President had been empowered to impose national security controls over exports based upon a standard of "necessary vigilance over exports from the standpoint of their significance to the national security." Act of Feb. 26, 1949, § 2.[1]

In 1962, the 1949 Act was amended to limit the use by the President of national security controls. The "national security" ground was refor-

---

[1] I note that the 1949 Act, as has every amendment to it since, singled out agricultural commodities for special consideration with regard to export controls. The 1979 Act reemphasizes that historic concern, setting forth in § 3(11) a policy "to minimize restrictions on the export of agricultural commodities and products."

1

mulated to authorize export controls "if the President shall determine that such export makes a significant contribution to the military *or economic* potential of" (emphasis added) a nation to be subjected to restrictions. This amendment clearly expressed a congressional determination that the contribution made by any embargoed goods be both significant and related to either the military or economic sectors of the foreign country involved.

In 1969, Congress further restricted the "national security" power over exports by removing, over the objection of spokesmen for the Nixon Administration, the phrase "or economic" from the language of what is now § 3(2)(A). This amendment was proposed in a bill cosponsored by then Senator Mondale in order to restrict the President's power over exports.

The legislative history and evolution of the President's power to control exports in the name of "national security" is instructive with regard to interpretation of the critical language in § 3(2)(A) in two regards. First, the goods to be embargoed must make a significant—as opposed to a minimal or marginal—contribution to military potential. The structure of the 1979 Act and its legislative history suggest that this significance may be based on either the volume or the nature of any particular proposed export. Second, this "significant contribution" must have an articulable factual nexus to "military potential."

Your memorandum of January 14, without stating a basis for its conclusion, assumes the basic factual predicate to invocation of § 5.

At the time I wrote my memorandum of January 10,* none of the agencies with access to the relevant information had come forward with facts that would establish a nexus between the grain embargo and the military potential of the Soviet Union as required under § 3(2)(A). You now advise that the Deputy Secretary of Defense has concluded on the basis of intelligence reports and historical experience: (1) That the denial of grain in the amounts involved here will significantly undermine public support among the Soviet populace for the Afghanistan invasion; and (2) that this deterioration of public support will undercut the resolve of the Soviet leadership to continue the occupation of Afghanistan. On this ground the Deputy Secretary of Defense has determined that these grain shipments make a significant contribution to the willingness and ability of the Soviet leadership to continue military operations in Afghanistan, and this resolve on the part of the Soviet leadership is an essential component of the "military potential" of the Soviet Union.

---

* NOTE: In a memorandum dated January 10, 1980, the Attorney General recommended to the President that he rely only upon § 6 of the 1979 Export Administration Act, and not upon § 5, in connection with his imposition of agricultural export controls. Section 6 authorizes export controls "to the extent necessary to further significantly the foreign policy of the United States or to fulfill its declared international obligations." 50 U.S.C. App. § 2405(a)(1). Ed.

The reason you advance in your January 14 memorandum for invoking § 5 as well as § 6 "when the action is clearly supportable under § 6 alone," is your judgment that the reliance on national security grounds will decrease the chances of a significant effort to organize a two-house veto as the statute provides in the case of § 6 actions. But there will be a report under § 6 in any event. And if there are to be hearings and if a resolution of disapproval is to be introduced, as we suspect will happen in any event, the procedural vehicle will be available. I also understand that it is your judgment, as well as the general consensus of the other involved agencies, that such a resolution of disapproval will fail regardless of whether we rely on § 6 alone or on both §§ 5 and 6. Therefore it is difficult for me to understand what strategic advantage is to be gained by including § 5.

I understand that you have put forward a second argument, which is not included in your January 14 memorandum, to the effect that President Carter said in the 1976 campaign that he would cut off grain sales to the Soviet Union only when national security required. But it seems rather clear from the series of campaign statements that the President in 1976 was not talking in the technical language of the Export Administration Act. He clearly served notice at that time that armed aggression by the Soviet Union which threatened our allies would constitute the kind of extreme circumstance in which it might be necessary to cut off the export of grain as well as other goods and materials to the Soviet Union. Whether the particular action would be taken under § 5 or § 6 of the Export Administration Act was not the issue. The President's action of blocking exports in this case is consistent with his 1976 statements.

In sum, the question whether the grain exports at issue here contribute significantly to the military potential of the Soviet Union is a question of fact. That question is for the determination of the President, and if he makes such a determination on the facts of this case he is authorized to invoke § 5. However, it is my view that the wiser course is to proceed on the basis of § 6 alone. I believe that the controversy and debate that will be generated in the Congress over the President's invocation of the limited national security authority provided under the Export Administration Act will unnecessarily cloud the real issue, which is the decision to cut off these grain shipments to the Soviet Union.

Sincerely,
BENJAMIN R. CIVILETTI

3